**Opinion filed July 8, 2010**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00118-CR
_____

### KRISTOPHER JOHN CAMNETAR, Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 22992A**

## M E M O R A N D U M   O P I N I O N

The jury convicted Kristopher John Camnetar of sexual assault. The trial court assessed punishment at thirty-five years confinement. In a single appellate issue, appellant challenges the factual sufficiency of the evidence to support his conviction. We affirm.

*Background*

The indictment alleged that appellant sexually assaulted RKS,[1] "by causing his male sexual organ to penetrate the mouth of [RKS], without the said [RKS's] consent and the said [appellant] compelled the said [RKS] to submit and participate by the use of physical force and

---

[1]RKS is short for the pseudonym – PSEURKS – that was used in the indictment.

violence." At trial, RKS testified that appellant had forced her to perform oral sex on him without her consent. During opening statements, appellant's counsel acknowledged that RKS had performed oral sex on appellant. Appellant's counsel claimed that RKS had agreed to perform oral sex on appellant for a fee of $20. In his appellate issue, appellant argues that the evidence was factually insufficient to show that he used physical force or violence as alleged in the indictment.

## Standard of Review

To determine if the evidence is factually sufficient, an appellate court reviews all of the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App. 2004)); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11. The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007); art. 38.04 (Vernon 1979).

## Evidence at Trial

The record shows that RKS was twenty-two years old at the time of trial. She lost most of her vision when she was seventeen years old as a result of having a brain tumor. She testified that she could see shapes and colors. RKS said that she walked with a cane. She used public transportation to meet her needs. On December 30, 2006, RKS took busses to three businesses in an attempt to cash her SSI check. She testified that the first two businesses would not cash her check but that Albertsons cashed it for her.

After leaving Albertsons, RKS walked toward the bus stop located at South 14th and Pioneer streets. She intended to take a bus to United Supermarket on South 14th Street. RKS testified that, as she was walking to the bus stop, a man drove up in a white van and offered her a ride. The police later identified the man as appellant. RKS testified that she accepted appellant's offer of a ride because she had been on her feet all day long and wanted to get to United as fast as possible. RKS said that she was unable to tell what appellant looked like. RKS testified that

2

she asked appellant to take her to United. RKS testified that she never propositioned appellant for prostitution.

Appellant asked RKS about her vision, and in response, RKS explained the extent of her visual impairment to appellant. Appellant asked RKS whether she would mind if he ran an errand before taking her to United. RKS told appellant that it was okay for him to run the errand. RKS testified that appellant drove past McMurry University and then drove to an abandoned area. RKS testified that she had no idea where they were and that she was extremely afraid.

RKS testified that appellant gave her two options. Appellant told her that she could either have sex with him and then he would take her to United or she could get out of the van. RKS said that she did not get out of the van because she did not know where she was and did not know what would happen to her if she did. RKS testified that she asked appellant, "Can't you just take me to United?" Appellant again said that he would take her to United if she had sex with him. RKS repeated, "Can't you just take me to United?" Appellant repeated that he would take her to United if she had sex with him. RKS testified that she said "[o]kay" and that she told appellant she would do whatever he wanted her to do. She testified that she did not willingly consent to having sex with appellant but that she was "willing to do whatever it took to get out of that situation because [she] was afraid."

Appellant asked RKS whether she would rather get into the backseat and have sex with him or give him a blow job. RKS said, "Whatever you want." RKS was sitting in the front passenger seat of the van. Appellant asked RKS to take off her jacket, and RKS did so. Appellant then told RKS to take off her shirt, and RKS complied. RKS testified that appellant exposed himself. She said that appellant grabbed her hair and head, pulled her down into his lap, pushed her head down, and penetrated her mouth with his penis. RKS testified that "[h]is penis was in my mouth, and he pushed my head down and I couldn't breathe, and so I tried to jerk my head up to breathe and he just pushed it back down again." RKS said that she was "on the verge of gagging a couple of times." She said that "[she] couldn't even come up to cough" and that appellant repeatedly pushed her head back down. RKS said that she did not fight with appellant when he shoved her head onto his penis because she was afraid that, if she did, appellant might injure or kill her. When appellant ejaculated, he held down RKS's head and told her to "swallow it."

3

After appellant ejaculated, he allowed RKS to sit up in the passenger seat and to put on her shirt and jacket. Appellant asked RKS for her wallet. RKS testified that appellant looked at her identification card and said, "[Y]ou better not tell anybody because now I know where you live." Appellant handed RKS's wallet back to her. Appellant then told RKS to get out of the van and walk. Appellant handed RKS her cane, and RKS got out of the van.

RKS testified that she started walking and that appellant drove away. RKS said that she had a cell phone when she got into the van but that she could not find it after she got out of the van. She said that she walked until she found a paved road. When RKS heard a vehicle, she waved her arms and screamed for help. Gary Jay, the driver of the vehicle, saw RKS frantically waiving at him. He stopped to help her. RKS told him that a man had forced her to perform oral sex. Jay testified that RKS was trembling, that it looked like she was in shock, and that her hair was messed up. Jay drove RKS to the police station.

Abilene Police Officer Eric Katona was working at the desk at the police station when Jay and RKS arrived. Officer Katona testified that RKS was visibly upset and that she was crying. RKS told him that a man had forced her to perform oral sex. Officer Katona called for an ambulance. When the ambulance arrived, RKS was taken to Hendrick Medical Center for examination. Carolyn Havins, a sexual assault nurse examiner at Hendrick, performed an examination of RKS. Using Q-tips, Nurse Havins took oral swabs from RKS's mouth.

The next day, RKS was at her mother's house. RKS testified that appellant's wife, Crystal Camnetar, brought a cell phone to the house. Crystal asked RKS whether the cell phone belonged to her, and RKS recognized the phone to be hers. RKS testified that Crystal said that she had discovered the address of the house by doing a reverse search on the phone number listed under "home" on the cell phone. Crystal had found RKS's cell phone in the van. RKS testified that Crystal said that appellant had been driving the van the day before. RKS's stepfather called the police, and Abilene Police Officer Anthony Joeris went to the house. When Officer Joeris arrived, RKS was inside the house, and appellant and Crystal were outside the house. Officer Joeris learned that the van was at a church. He went to the church and took pictures of the van. Officer Joeris testified that Crystal told him that appellant usually drove the van.

Abilene Police Detective Willie Ford obtained a search warrant for taking DNA samples from appellant. Using buccal swabs, Detective Ford collected DNA samples from appellant.

4

Detective Ford also collected DNA samples from RKS.  Naomi McDonald, a forensic scientist with the DPS crime lab in Lubbock, tested the oral swabs that Nurse Havins had collected from RKS at Hendrick.  The testing revealed the presence of semen and spermatozoa.  McDonald then took the DNA samples that had been obtained from appellant and RKS and proceeded with a DNA analysis.  Based on her analysis, McDonald concluded that the DNA profile from the sperm fraction of the oral swab that had been taken from RKS at the hospital was consistent with a mixture of appellant's DNA and RKS's DNA.

*Analysis*

In his brief, appellant asserts that, "[w]hen taken as a whole[,] [RKS's] testimony indicates that she was coerced to perform oral sex but she was not subjected to physical force or violence as alleged in the indictment."  Appellant relies on testimony by RKS during cross-examination that, when faced with choosing between giving appellant oral sex or being left stranded in an unfamiliar area, she agreed to perform oral sex.  RKS further testified that there had been no physical force or violence when she agreed to perform oral sex.  Based on this testimony, appellant contends that the evidence was factually insufficient to establish that he used physical force or violence to compel RKS to perform oral sex.

RKS testified that she did not consent to performing oral sex on appellant.  RKS testified that she was willing to do whatever it took to get out of the situation because she was afraid.  Based on RKS's testimony, the jury could have reasonably concluded that RKS did not willingly agree to perform oral sex on appellant but only agreed to perform oral sex out of fear.  RKS testified that she did not initiate the oral sex.  RKS said that, instead, appellant grabbed her by the hair and head, pulled her down into his lap, pushed her head down, and forced her to perform oral sex on him.  RKS also said that she tried to jerk her head up to breathe but that appellant repeatedly pushed her head back down again.  RKS's testimony supports the jury's conclusion that appellant compelled her to submit to oral sex by the use of physical force.  *See Gonzales v. State*, 2 S.W.3d 411, 415 (Tex. App.—San Antonio 1999, no pet.) (Evidence that appellant "threw" or "laid" the victim on a couch and then prevented the victim from moving by lying on top of her was legally and factually sufficient to prove that the appellant used physical force.); *Barnett v. State*, 820 S.W.2d 240, 241 (Tex. App.—Corpus Christi 1991, pet. ref'd) (Evidence that the appellant straddled the victim's chest, moved the victim's head in an apparent thrusting

motion, and pushed the victim's head back down when the victim attempted to get up was sufficient to show that the appellant used physical force.).

The evidence is factually sufficient to support appellant's conviction. We overrule appellant's sole issue.

*This Court's Ruling*

We affirm the trial court's judgment.


TERRY McCALL

JUSTICE


July 8, 2010

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.